IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

STARLOE JANE MCGINNIS,                    )
        Plaintiff,                        )
                             )
        v.                                )      Civil No. 3:18cv797 (REP)
                             )
ANDREW M. SAUL[1],                        )
Commissioner of Social Security,          )
        Defendant.                        )
_____ )

REPORT AND RECOMMENDATION

On December 22, 2014, Starloe Jane McGinnis ("Plaintiff") applied for Social Security

Disability Benefits ("DIB") under the Social Security Act (the "Act"), alleging disability from

depression, anxiety, panic attacks, high blood pressure, high cholesterol and "knee effusion and

cartilage trouble in the right knee," with an alleged onset date of December 13, 2014. The Social

Security Administration ("SSA") denied Plaintiff's claim both initially and upon reconsideration.

Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claim in a written decision,

and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as

the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred by: (1) characterizing Plaintiff's knee impairment as non-severe at

step two and failing to consider her knee impairment in assessing her residual functional capacity

---

[1]     On June 4, 2019, the United States Senate confirmed Andrew M. Saul to a six-year term
as the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d),
Commissioner Saul should be substituted for former Acting Commissioner Nancy A. Berryhill
as the defendant in this matter.

("RFC"); and, (2) providing an insufficient explanation for affording little or partial weight to the opinions relating to Plaintiff's mental abilities. (Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 18) at 1, 8-12.) This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross motions for summary judgment, rendering the matter ripe for review.[2] For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 17) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 19) be DENIED and that the final decision of the Commissioner be VACATED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## I.    PROCEDURAL HISTORY

On December 22, 2014, Plaintiff filed an application for DIB, with an alleged onset date of December 13, 2014. (R. at 17, 92.) The SSA denied this claim initially on April 27, 2015, and again upon reconsideration on August 27, 2015. (R. at 91, 106.) On October 30, 2017, the ALJ issued a written opinion, denying Plaintiff's claim and concluding that Plaintiff did not qualify as disabled under the Act, because Plaintiff could perform work that exists in significant numbers in the national economy. (R. at 17-28.) On September 17, 2018, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-3.)

---

[2]    The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

## II.   STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*,

3

667 F.3d at 477.  If substantial evidence in the record does not support the ALJ's determination

or if the ALJ has made an error of law, the court must reverse the decision.  *Coffman v. Bowen*,

829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine

whether disability exists.  20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35

(describing the ALJ's five-step sequential evaluation).  To summarize, at step one, the ALJ looks

at the claimant's current work activity.  § 404.1520(a)(4)(i).  At step two, the ALJ asks whether

the claimant's medical impairments meet the regulations' severity and duration requirements.

§ 404.1520(a)(4)(ii).  Step three requires the ALJ to determine whether the medical impairments

meet or equal an impairment listed in the regulations.  § 404.1520(a)(4)(iii).  Between steps three

and four, the ALJ must assess the claimant's RFC, accounting for the most that the claimant can

do despite her physical and mental limitations.  § 404.1545(a).  At step four, the ALJ assesses

whether the claimant can perform her past work given her RFC.  § 404.1520(a)(4)(iv).  Finally,

at step five, the ALJ determines whether the claimant can perform any work existing in the

national economy.  § 404.1520(a)(4)(v).

### III.   THE ALJ'S DECISION

On May 12, 2017, the ALJ held a hearing during which Plaintiff (represented by counsel)

and a vocational expert ("VE") testified.  (R. at 36-79.)  On October 30, 2017, the ALJ issued a

written opinion, finding that Plaintiff did not qualify as disabled under the Act.  (R. at 14-28.)

The ALJ followed the five-step evaluation process established by the Social Security Act

in analyzing Plaintiff's disability claim.  (R. at 17-28.)  At step one, the ALJ determined that

Plaintiff had not engaged in substantial activity since December 13, 2014, her alleged onset date.

(R. at 19.)  At step two, the ALJ determined that Plaintiff suffered from the following severe

4

impairments: depression and anxiety. (R. at 19.)  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (R. at 21.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform the full range of work at all exertional levels, with additional non-exertional limitations. (R. at 23.)  Specifically, the ALJ determined that Plaintiff could focus and concentrate for only two hours before requiring a fifteen-minute break, required a goal-oriented rather than a production-rate-pace job, and could sustain only occasional interaction with supervisors and co-workers and no interaction with the public. (R. at 23.)

Based on Plaintiff's RFC, at step four, the ALJ found that Plaintiff could not perform her past relevant work. (R. at 26.)  However, at step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy, including the representative occupations of administrative clerk and computing clerk. (R. at 27.)  Accordingly, the ALJ concluded that Plaintiff did not qualify as disabled under the Act. (R. at 28.)

## IV.   ANALYSIS

Plaintiff, sixty-three years old at the time of this Report and Recommendation, previously worked as a bookkeeper. (R. at 84.)  She applied for DIB, alleging disability from depression, anxiety, panic attacks, high blood pressure, high cholesterol and "knee effusion and cartilage trouble in the right knee," (which Rachel Waller, M.D., later diagnosed as osteoarthritis), with an alleged onset date of December 13, 2014. (R. at 92.)  Plaintiff's appeal to this Court alleges that the ALJ erred by: (1) characterizing Plaintiff's knee impairment as non-severe at step two and failing to consider her knee impairment in assessing her RFC; and, (2) providing an insufficient

explanation for affording little or partial weight to the opinions relating to Plaintiff's mental abilities. (Pl.'s Mem. at 1, 8-12.) For the reasons set forth below, the ALJ erred in her decision.

**A.   Although the ALJ Did Not Err in Assessing the Severity of Plaintiff's Knee Impairment at Step Two, She Erred in Failing to Consider it at Subsequent Steps in Her Assessment, Requiring Remand.**

Plaintiff argues that the ALJ erred in determining that the osteoarthritis in her right knee did not qualify as "severe" as defined by 20 C.F.R. § 404.1522(a). (Pl.'s Mem. at 8.) Plaintiff further contends that the ALJ incorrectly afforded little weight to the opinion of Karissa Hackleton, M.D., regarding her physical limitations. (Pl.'s Mem. at 9.) Alternatively, Plaintiff alleges that the ALJ erred in failing to properly consider Plaintiff's knee impairment in formulating her RFC. (Pl.'s Mem. at 8-9.) Plaintiff adds that her use of a cane illustrated her need for additional exertional limitations. (Pl.'s Mem. at 9.)

Defendant responds that substantial evidence supports the ALJ's assessment of Plaintiff's knee impairment, noting that courts cannot reweigh the evidence on judicial review. (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (ECF No. 19) at 14-17.) Defendant further contends that the ALJ correctly afforded Dr. Hackleton's opinion regarding Plaintiff's knee impairment only little weight. (Def.'s Mem. at 14-17.) Moreover, because no medical source prescribed a cane to Plaintiff, Defendant argues that the ALJ properly excluded consideration of Plaintiff's intermittent cane use. (Def.'s Mem. at 15-16.) The Court agrees with Defendant that the ALJ did not err in her severity assessment at step two, but finds that the ALJ erred by failing to consider Plaintiff's knee impairment at all when crafting Plaintiff's RFC.

**1.   The ALJ Properly Characterized Plaintiff's Knee Impairment as Non-Severe at Step Two.**

At step two, the ALJ must consider the claimant's medically determinable impairments and determine which are "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1521. "The Supreme

Court has held that this step of the disability evaluation is a *de minimis* threshold." *Williams v. Astrue*, 2010 WL 395631, at *14 (E.D. Va. Feb. 2, 2010) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146-47 (1987)), *report and recommendation adopted*, at *1.

An ALJ satisfies step two by finding a severe impairment and proceeding through the rest of the sequential analysis. *McCormick v. Soc. Sec. Admin., Comm'r*, 619 F. App'x 855, 858 (11th Cir. 2015); *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) ("[T]he finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two.")  Plaintiff has the burden of demonstrating that she has an "impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *Bowen*, 482 U.S. at 146. The claimant's impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509.

A severe impairment causes more than a minimal effect on one's ability to function. § 404.1520(c).  Likewise, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [one's] physical or mental ability to do basic work activities." § 404.1522(a).  An ALJ will find a claimant not disabled at step two if she "do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . ., or a combination of impairments that is severe and meets the duration requirement." § 404.1520(a)(4)(ii).

Here, the ALJ concluded that Plaintiff's knee impairment did not qualify as severe, because it caused no more than minimal vocationally relevant limitations, did not meet the durational requirement and lacked support from the medical evidence of record. (R. at 19-20.)

Case 3:18-cv-00797-REP   Document 25   Filed 09/23/19   Page 8 of 27 PageID# 164


In support of this conclusion, the ALJ acknowledged Plaintiff's testimony that she used a cane when leaving her house. (R. at 20.) The ALJ also recited Plaintiff's knee-related medical history, observing that Plaintiff first sought treatment for right-knee pain in December 2014. (R. at 20.) The ALJ noted that Plaintiff's physical examination during the December 2014 emergency room visit revealed tenderness and a limited range of motion in her right knee, and the ALJ recited x-ray results showing minimal degenerative joint disease and "very tiny joint effusion" in Plaintiff's knee. (R. at 20.) The ALJ observed that the hospital discharged Plaintiff with pain medications. (R. at 20.)

Continuing through Plaintiff's medical history, the ALJ noted that Plaintiff complained of ineffective medicative treatment during a March 2015 appointment; however, the ALJ observed that during the same appointment, Plaintiff exhibited no abnormalities on examination. (R. at 20.) And although Plaintiff ambulated with a cane, the ALJ noted that she could move around independently and effectively. (R. at 20.) The ALJ recited the results of a November 2016 x-ray showing osteoarthritis in all three compartments of Plaintiff's right knee, but noted that her examination that same day revealed a normal range of motion, normal strength and no tenderness in Plaintiff's knee. (R. at 20.) And the ALJ emphasized Plaintiff's generally normal examinations throughout the record. (R. at 20.) Ultimately, the ALJ discredited Plaintiff's use of a cane, noting that it had not been prescribed by a treating source. (R. at 20.)

The Court finds the ALJ's explanation legally sufficient, because she appropriately cited objective evidence in the record to support her conclusion. (R. at 20.) Moreover, the Court's own review of the record finds substantial evidence to support the ALJ's assessment of Plaintiff's right-knee impairments.

As the ALJ noted, Plaintiff first sought treatment for knee pain on December 27, 2014,

when she presented to Southside Regional Medical Center's ("SRMC") emergency department.

(R. at 20, 328.)  Khalid Khan, M.D., noted that Plaintiff had a limited range of motion,

tenderness and some effusion in her right knee.  (R. at 331.)  However, as the ALJ noted, x-rays

of Plaintiff's right knee indicated only "minimal degenerative joint disease and very tiny joint

effusion."  (R. at 20, 328.)  Plaintiff left the hospital the same day with a knee brace, crutches

and a prescription for pain medications.  (R. at 331.)

On March 30, 2015, Plaintiff returned to Dr. Hackleton.  (R. at 354.)  Dr. Hackleton

noted no abnormalities with Plaintiff's knee, though Plaintiff reported "[h]aving pain in [her]

right knee" after a fall a few months earlier.  (R. at 354.)  On April 8, 2015, Michael Fielding,

Ph.D., a consultative examiner, assessed Plaintiff, observing that Plaintiff had a limp but that

"[s]he was able to move about the office independently and effectively with the use of a cane."

(R. at 342.)

Dr. Waller examined Plaintiff on November 21, 2016.  (R. at 388.)  During that visit, a

new x-ray revealed that Plaintiff had osteoarthritis in all three compartments of her right knee,

with "moderate" osteoarthritis in the medial compartment.  (R. at 393.)  Nonetheless, on physical

examination, Plaintiff exhibited a normal range of motion, normal strength and no signs of

tenderness in her right knee.  (R. at 391.)

Together, the objective medical records support the ALJ's characterization of Plaintiff's

knee impairment as non-severe, showing minimal treatment and normal findings on examination.

Notably, at step two, the ALJ also afforded great weight to the opinions of Richard Surrusco,

M.D., Jack Hutcheson, M.D., Alice Rogado, M.D., and Steven Golub, M.D., all of whom

described Plaintiff's knee impairment as non-severe.  (R. at 20, 85, 98, 379, 437.)  The medical

evidence of record supports the ALJ's assignment of weight to these opinions, further bolstering the ALJ's step-two conclusion. Although Plaintiff argues that her unprescribed, intermittent cane use contradicts the ALJ's step-two determination, "'[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn*, 607 F. App'x. at 274 (quoting *Clarke*, 843 F.2d at 272-73). Accordingly, the Court finds no error.

### 2.    *The ALJ Properly Weighed Dr. Hackleton's Opinion Evidence with Respect to Plaintiff's Alleged Knee Impairment.*

Plaintiff also contends that the ALJ erred at step two in affording Dr. Hackleton's opinion regarding her knee impairment only little weight. (Pl.'s Mem. at 9.) Defendant responds that the ALJ adequately explained her assignment of weight to Dr. Hackleton's opinion and that substantial evidence supports the weight assigned. (Def.'s Mem. at 16-17.)

During the sequential analysis, when the ALJ determines whether a claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. § 404.1527(c). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. § 404.1527(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight.  SSR 06-3p.[3]  Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability.  §§ 404.1513(a), 404.1527(a).  The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists.  SSR 06-03p; § 404.1527(f).[4]  Under the applicable regulations and case law, a treating source's opinion must recieve controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p.  Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, for example, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion proves inconsistent with other evidence or when it otherwise lacks evidentiary support. §§ 404.1527(c)(3)-(4), (d).

---

[3]      Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. §§ 404.1527(f), 416.927(f).  82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017).  Plaintiff filed her claim on December 22, 2014, before this regulation took effect. (R. at 92.)  The Agency does not have the power to engage in retroactive rulemaking.  *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power).  Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim.

[4]      The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1527(f) and 416.927(f).  The given examples are a non-exhaustive list.  SSR 06-03p.

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should remain untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. § 404.1527(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. § 404.1527(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors can apply in evaluating opinion evidence from "other sources." SSR 06-03p.

On June 16, 2015, Dr. Hackleton completed forms provided by Plaintiff's representatives that included both mental and physical RFC assessments. (R. at 364-70.) In completing her assessment of Plaintiff's physical abilities, Dr. Hackleton wrote that Plaintiff suffered from anxiety, depression, osteoarthritis in her knee and a fourth, illegible diagnosis. (R. at 369.) Dr. Hackleton marked that Plaintiff's impairments frequently interfered with her ability to maintain the attention and concentration necessary to complete simple, work-related tasks. (R. at 369.) Dr. Hackleton estimated that Plaintiff would need to lie down during an eight-hour workday more frequently than the typical fifteen-minute breaks in the morning and afternoon and thirty-to-sixty-minute break for lunch. (R. at 369.)

12

Regarding Plaintiff's functional abilities, Dr. Hackleton estimated that Plaintiff could walk less than one city block without rest or significant pain and could sit for no more than one hour and stand/walk for no amount of time during an eight-hour workday. (R. at 369.) Dr. Hackleton further estimated that Plaintiff would require five to six unscheduled breaks throughout the workday, each lasting approximately thirty minutes. (R. at 369.) Regarding Plaintiff's exertional abilities, Dr. Hackleton marked that Plaintiff could never lift any amount of weight, and Dr. Hackleton also wrote that Plaintiff could never finger, reach, grasp, turn and twist with her arms and hands. (R. at 369.) Ultimately, Dr. Hackleton estimated that Plaintiff's impairments and associated treatment would require her to miss work more than four times a month. (R. at 370.)

At step two, the ALJ afforded Dr. Hackleton's opinion little weight, explaining that it proved inconsistent with the objective medical evidence. (R. at 21.) Specifically, the ALJ observed no objective evidence supporting the upper-extremity limitations endorsed by Dr. Hackleton. (R. at 21.) And the ALJ explained that although Plaintiff suffered from degenerative joint disease, Plaintiff continued to exhibit normal strength and range of motion and no tenderness in her right knee, undermining Dr. Hackleton's findings. (R. at 21, 328, 383, 391, 393, 427.) The Court finds the ALJ's explanation legally sufficient, for the ALJ provided a narrative explanation with citations to specific parts of the record. (R. at 21.) Importantly, the Court's own review of the record finds substantial evidence to support the ALJ's assignment of weight.

Although Plaintiff presented to Dr. Hackleton multiple times, other than repeating Plaintiff's complaints of knee pain, Dr. Hackleton did not note any abnormalities with, or treatment of, Plaintiff's right knee. (R. at 348-58.) Moreover, when Plaintiff presented to Dr.

13

Khan, he diagnosed only "minimal degenerative joint disease and very tiny joint effusion" in

Plaintiff's right knee. (R. at 328.)  Although Dr. Khan noted that Plaintiff had a limited range of

motion, tenderness and some effusion in her right knee, Plaintiff left the hospital the same day

after staff provided her with medications, a knee brace and crutches.  (R. at 331.)  Further, as the

ALJ noted, despite "moderate" osteoarthritis, Plaintiff continued to exhibit a normal range of

motion, normal strength and no tenderness in her right knee.  (R. at 21, 391, 393.)  And nothing

in the record indicates that Plaintiff suffered from upper-extremity impairments that would limit

her manipulative and reaching abilities to the degree Dr. Hackleton opined.

    Together, Plaintiff's medical records clearly support the ALJ's assignment of little weight

to Dr. Hackleton's opinion.  Contrary to Plaintiff's suggestion, Dr. Hackleton's status as

Plaintiff's treating physician cannot remedy the lack of support in the record for her restrictive

limitations.  Because the ALJ cited to evidence contradicting Dr. Hackleton's opinion, and

because substantial evidence supports the ALJ's findings, the Court finds no error.

### 3. *The ALJ Erred by Failing to Consider Plaintiff's Knee Impairment When Assessing Her RFC, Requiring Remand.*

    Assuming the ALJ did not err in characterizing her knee impairment as non-severe at step

two, Plaintiff argues that the ALJ erred in failing to properly consider her knee impairment in

formulating the RFC.  (Pl.'s Mem. at 8-9.)  Plaintiff adds that her use of a cane illustrated her

need for additional exertional limitations.  (Pl.'s Mem. at 9.)  Defendant does not respond

directly to this argument.

    After step three of the analysis, but before deciding whether a claimant can perform past

relevant work at step four, the ALJ must determine the claimant's RFC.  20 C.F.R.

§§ 404.1520(e)-(f), 404.1545(a)(1).  In analyzing a claimant's abilities, an ALJ must first assess

the nature and extent of the claimant's physical and mental limitations and then determine the

14

claimant's RFC for work activity on a regular and continuing basis.  § 404.1545(b).  The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that have basis on the claimant's credible complaints.  § 404.1545(e).  Importantly, an "ALJ must consider the effects of *both the severe and non-severe impairments* at the subsequent steps of the process, including the determination of residual functional capacity."  *Fountain v. Astrue*, 2013 WL 145873, at *3 (D. Md. Jan. 11, 2013) (emphasis supplied) (citations omitted).

The ALJ must also conduct a function-by-function analysis in assessing a claimant's RFC.  Remand may be appropriate in cases where the ALJ fails to assess a claimant's capacity to perform relevant functions, or where the ALJ's analysis contains inadequacies that frustrate meaningful review.  *Mascio*, 780 F.3d at 635-36.  The ALJ's assessment must include a narrative discussion of how the evidence supports each conclusion, citing specific medical facts and non-medical evidence, including daily activities and observations.  SSR 96-8p.  Ultimately, "the ALJ must *both* identify evidence that supports his conclusion *and* 'build an accurate and logical bridge from [that] evidence to his conclusion.'"  *Woods v. Berryhill*, 883 F.3d 686, 694 (4th Cir. 2018) (emphasis included in original) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).

Here, the ALJ stated that Plaintiff had the RFC to perform a full range of work at all exertional levels, with some non-exertional limitations.  (R. at 23.)  Specifically, the ALJ explained that Plaintiff could focus and concentrate for only two hours before requiring a fifteen-minute break and required a goal-oriented, rather than production-rate-pace, job.  (R. at 23.)  The ALJ also limited Plaintiff to only occasional interaction with supervisors and co-workers and no interaction with the public.  (R. at 23.)

15

The ALJ's RFC assessment included no exertional limitations, which, alone, does not require remand, so long as the ALJ adequately explained why Plaintiff's knee impairment did not result in any exertional limitations. *Mascio*, 780 F.3d at 635-36; (R. at 23.)  However, the ALJ's narrative explanation in support of her RFC assessment provides no such explanation, depriving the Court of an "accurate and logical bridge" from the evidence of record to the ALJ's ultimate conclusion. *Woods*, 883 F.3d at 694 (internal quotations omitted); (R. at 23-26.)

Indeed, in assessing Plaintiff's subjective complaints, the ALJ focused only on Plaintiff's mental impairments, failing to recognize Plaintiff's complaints regarding her knee. (R. at 23-24, 60-62.)  And the ALJ likewise provided no discussion of the medical records describing Plaintiff's knee impairment. (R. at 24-25.)  Moreover, although the ALJ discussed the medical opinions addressing Plaintiff's knee impairment at step two, the ALJ's discussion of those opinions did not offer any explanation as to why Plaintiff's knee impairment resulted in no additional RFC limitations. (R. at 20-21.)  In fact, in assessing Dr. Hackleton's opinion at step two, the ALJ concluded that the evidence of record did not support the "degree" of limitation endorsed by Dr. Hackleton, leaving open the possibility that Plaintiff's knee impairment resulted in some lesser degree of limitation of the kind described in Dr. Hackleton's opinion. (R. at 21.)

Given that objective medical evidence in the record, including imaging studies and clinical findings, supported the existence of Plaintiff's knee impairment, § 404.1545(a)(2) required the ALJ to consider Plaintiff's knee problems when crafting Plaintiff's RFC. (R. at 393.)  The ALJ's failure to consider Plaintiff's knee impairment constitutes harmful error, because it deprives the Court of its ability to meaningfully review the ALJ's opinion, including whether the ALJ properly ignored Plaintiff's use of a cane. *See Allen v. Comm'r of Soc. Sec.*, 2010 WL 1142031, at *15 (E.D. Va. Feb. 24, 2010) (holding that an ALJ's failure to consider

16

non-severe impairments constituted reversible error).  Ultimately, the ALJ's failure to consider

the limiting effects of Plaintiff's knee impairment or to explain why Plaintiff's knee impairment

resulted in no additional limitations requires remand.

**B.      The ALJ Failed to Adequately Explain Her Assignment of Weight to the Opinion Evidence, Requiring Remand.**

Plaintiff argues that the ALJ failed to properly weigh the opinion evidence concerning

her mental impairments.  (Pl.'s Mem. at 9.)  Specifically, Plaintiff contends that the ALJ erred in

explaining her assignment of partial weight to the opinions of Joseph Leizer, M.D., and Henry

Schniewind, M.D., because the ALJ did not discuss why those opinions proved inconsistent with

the findings of the consultative examiner, Dr. Fielding.  (Pl.'s Mem. at 11.)  Plaintiff further

contends that the ALJ erred in explaining her assignment of weight to Dr. Fielding's opinion by

"not explain[ing] how the objective findings actually required that Dr. Fielding be granted less

weight."  (Pl.'s Mem. at 11.)  Finally, Plaintiff contends that the ALJ erred when she explained

her assignment of weight to Dr. Hackleton's opinion by failing to describe why it proved "more

restrictive than shown by the objective evidence" and by not granting Dr. Hackleton more

deference due to her status as Plaintiff's treating physician.  (Pl.'s Mem. at 12.)  Defendant

responds that the ALJ adequately explained her reasoning and appropriately limited the weight

assigned to each of the physicians.  (Def.'s Mem. at 19-25.)

The Court finds that the ALJ erred by failing to sufficiently explain her reasoning for

assigning weight to the medical opinions.  The Fourth Circuit has provided guidance for how to

address such inadequate explanation, establishing that where the Court must "guess about how

the ALJ arrived at his conclusions on [a claimant's] ability to perform relevant functions . . .

remand is necessary." *Mascio*, 780 F.3d at 637.  Because the explanations for the weight

assigned to all four opinions prove deficient for a common reason, the Court will first recite the opinions and the ALJ's explanation for the weight assigned.

### 1.   Drs. Leizer and Schniewind

Dr. Leizer, a state agency psychological consultant, reviewed Plaintiff's medical records at the reconsideration stage. (R. at 98-102.) Dr. Leizer opined that Plaintiff suffered from several medically determinable impairments ("MDIs"), namely:  essential hypertension, major joints dysfunction, hyperlipidemia, affective disorders, anxiety disorders and substance addiction disorders. (R. at 98.)  Although he determined that one or more of these MDIs could reasonably be expected to produce Plaintiff's alleged symptoms, Dr. Leizer found that the objective medical evidence, alone, did not support Plaintiff's subjective complaints, finding Plaintiff's statements regarding her symptoms only partially credible. (R. at 100.)  Specifically, Dr. Leizer found that Plaintiff's MDIs caused only "mild functional deficits" rather than the "marked functional deficits" that Plaintiff endorsed. (R. at 100.)  Dr. Leizer explained that he reviewed Dr. Hackleton's June 2015 opinion and found it inconsistent with the medical evidence. (R. at 100.) He further opined that Dr. Fielding's opinion "[was] not well-supported by medically acceptable clinical and laboratory diagnostic techniques" and gave it "little weight." (R. at 100.)

Regarding Plaintiff's functional abilities, Dr. Leizer explained that Plaintiff had mild restriction in her activities of daily living, no difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace, and no repeated episodes of decompensation. (R. at 101.)  He further opined that Plaintiff had no limitations in understanding and memory. (R. at 101.)  Dr. Leizer specified that Plaintiff had moderate limitations in her ability to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychological symptoms

and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 101.) Dr. Leizer further opined that Plaintiff could carry out instructions, perform activities within a schedule, work around others and sustain an ordinary routine without special supervision. (R. at 101.) Dr. Schniewind reviewed Dr. Leizer's opinion and affirmed it in its entirety. (R. at 377-78.)

The ALJ afforded Dr. Leizer and Dr. Schniewind's opinions partial weight. (R. at 25.) After reciting the findings of both opinions, the ALJ noted that during Plaintiff's consultative examination with Dr. Fielding, claimant exhibited intact memory, no evidence of cognitive deficits, could spell "world" backwards, and could complete serial threes and simple math calculations. (R. at 25.) The ALJ also noted that Plaintiff exhibited normal attention and concentration on examination despite a flat affect and complaints of panic attacks and racing thoughts. (R. at 25.) And the ALJ cited to Dr. Fielding's finding that Plaintiff could not regulate her life now as well as she had in the past. (R. at 25.) The ALJ opined that Plaintiff had "some moderate degree of limitation," which entitled the doctors' opinions to partial weight. (R. at 25.)

### 2.   *Dr. Fielding*

Dr. Fielding conducted a consultative examination of Plaintiff on April 8, 2015.[5] (R. at 341.) The exam included a clinical interview and mental status examination, as well as a review of some of Plaintiff's medical records. (R. at 341.)

Upon initial impression, Dr. Fielding noted that a friend dropped Plaintiff off for her appointment. (R. at 342.) Dr. Fielding observed that Plaintiff had a compromised gait with a noticeable limp, using a cane in her left hand. (R. at 342.) He clarified that Plaintiff had

---

[5]     Although Dr. Fielding's Psychology Report indicates that he examined Plaintiff on April 8, 2011, the year of examination appears to be a typographical error. The Court believes that Dr. Fielding conducted the exam in 2015, rather than 2011.

19

adequate balance with use of the cane. (R. at 342.) Plaintiff complained of knee problems, which worsened on rainy days such as the day of the exam. (R. at 342.) Dr. Fielding found that Plaintiff's fine motor skills appeared intact, though her knee problem compromised her gross motor skills. (R. at 342.) Plaintiff reported that she had difficulty dressing if she needed to put clothes on over her feet and that her right knee and left trunk were "always in pain." (R. at 342.) And Plaintiff claimed disability because of her depression, anxiety, knee problems and high blood pressure. (R. at 342.) Dr. Fielding opined that Plaintiff reliably described her medical history. (R. at 342.)

In describing her activities of daily living, Plaintiff reported that she could use the bathroom and dress, except that she had trouble putting her socks on and putting clothes on over her feet. (R. at 343.) Plaintiff described herself as a "TV-holic" and explained that she used the computer at times. (R. at 343.) Plaintiff also admitted to smoking marijuana two or three times a week and drinking occasionally, but denied negative consequences as a result of her substance use. (R. at 343.)

On examination, Plaintiff appeared appropriately dressed, with normal grooming, good eye contact and cooperative behavior. (R. at 343.) Plaintiff also displayed normal impulsivity and gratification control. (R. at 343.) She did not have any difficulty separating from others for her assessment. (R. at 343.) Dr. Fielding further noted that Plaintiff had "quite good" speech flow, describing her as "very much a talker." (R. at 343-44.) Dr. Fielding assessed Plaintiff's thought processes as "logical and organized," describing her thought content as "consistent with reality." (R. at 344.) And Plaintiff did not present or report problems with hallucinations, delusions, paranoia or thought disorders. (R. at 344.)

Describing her impairments, Plaintiff rated her depression as "a 9 on a 1-10 scale with 10 being high." (R. at 344.)  Plaintiff explained that her treatment providers had recently adjusted her depression medications. (R. at 344.)  Although Plaintiff denied any recent plans to commit suicide, she explained that she had made plans in the past. (R. at 344.)  Plaintiff also reported that her appetite "[was] not like it used to be" and explained that her medications were "not working yet." (R. at 344.)  Plaintiff described her self-esteem as "nonstop[-]low as it can be since she lost her job." (R. at 344.)

Regarding self-regulation, Plaintiff opined that she could still manage her life if she had the money to do so. (R. at 344.)  Plaintiff also described her motivation as "close to zero." (R. at 344.)  Dr. Fielding noted that Plaintiff's affect appeared "on the flat side." (R. at 344.)  Plaintiff reported that she experienced panic attacks whenever she left the house, manifesting in chest tightness and her arm "get[ting] heavy." (R. at 344.)  She also explained that she felt like she would have an "anxiety attack" whenever guests came by her home. (R. at 344.)  Plaintiff told Dr. Fielding that she suffered from a stroke three years earlier, though Dr. Fielding explained that the issue "would need to be further assessed with testing, if needed." (R. at 344.)

Dr. Fielding opined that Plaintiff appeared alert and did not display "cognitive deficits for the purposes of [the] examination." (R. at 344.)  During cognitive testing, Plaintiff could spell "world" backwards, perform serial threes and had no difficulty with simple math questions. (R. at 344.)  Plaintiff could also express herself and understand at an age-appropriate level. (R. at 344.)  Dr. Fielding reported that Plaintiff's "overall intelligibility and articulation were intact" and that "[s]he was able to maintain conversational speech." (R. at 344.)  Dr. Fielding further noted that Plaintiff's concentration, focus and attention proved adequate and that she had intact

memories. (R. at 344.) Plaintiff could also orient to time, place, person and situation, and make decisions. (R. at 344.)

Based on his assessment, Dr. Fielding diagnosed Plaintiff with major depressive disorder, depression due to a general medical condition, unspecified anxiety disorder with panic symptoms without agoraphobia and substance abuse disorder. (R. at 344.) After explaining the justifications for his diagnoses, Dr. Fielding opined that Plaintiff could acquire and use information, take advantage of community resources by herself and complete simple and repetitive tasks, but "not so much detailed and complex tasks in her current state of mind." (R. at 346.) Dr. Fielding stated that Plaintiff would not appear as a very attractive candidate in an interview and that being without a job "puts her with more severe mental health symptoms." (R. at 346.) Dr. Fielding opined that "even with special and additional supervision [Plaintiff] would have difficulty functioning," but he "hope[d]" that Plaintiff's symptoms would improve if she secured employment. (R. at 346.) Dr. Fielding noted that if Plaintiff "were able to obtain employment right now, it is suspected it would be on a very marginal level in terms of performance at first." (R. at 346.)

The ALJ afforded Dr. Fielding's opinion little weight. (R. at 26.) After reviewing Dr. Fielding's findings, the ALJ noted that Dr. Fielding "did not use specific vocational terminology to explain [Plaintiff's] function-by-function limitations." (R. at 26.) The ALJ also stated that Dr. Fielding's opinion proved inconsistent with the evidence of record, noting that during Dr. Fielding's examination, Plaintiff exhibited no cognitive deficits and could spell "world" backwards and complete serial threes and simple math equations. (R. at 26.) The ALJ further noted that Plaintiff exhibited normal attention and concentration on examination despite a flat affect and complaints of panic attacks and racing thoughts. (R. at 26.) And the ALJ recited Dr.

22

Fielding's finding that Plaintiff could not regulate her life now as well as she had in the past. (R. at 26.)

### 3. *Dr. Hackleton*

On June 16, 2015, Dr. Hackleton described Plaintiff's mental and physical capacity in two forms provided by Plaintiff's representatives. (R. at 364-70.) Regarding Plaintiff's mental capacity, Dr. Hackleton opined that Plaintiff had a "marked" (i.e., serious, meaning Plaintiff could not perform "satisfactorily" in the given area) degree of limitation in her ability to remember locations and work-like procedures and to understand and remember very short and simple instructions, as well as detailed instructions. (R. at 365.) When asked to describe the medical or clinical findings that supported this assessment, Dr. Hackleton provided no response. (R. at 365.)

Regarding Plaintiff's ability to maintain concentration and persistence, Dr. Hackleton opined that Plaintiff had marked limitations in her ability to: (1) carry out very short and simple instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or in proximity to other workers without being distracted by them; (7) make simple work-related decisions; (8) complete a normal workday and workweek without interruptions from psychological symptoms; and, (9) perform at a consistent pace with a standard number and length of rest periods. (R. at 365-66.) Dr. Hackleton further opined that Plaintiff would likely have four or more absences from work in an average month. (R. at 366.) Notably, when prompted, Dr. Hackleton again failed to identify any medical or clinical findings that supported her assessment. (R. at 366.)

23

As for Plaintiff's social limitations, Dr. Hackleton opined that Plaintiff had a marked limitation in her ability to: (1) interact appropriately with the public; (2) ask simple questions or request assistance; (3) accept instructions and respond appropriately to criticism from supervisors; (4) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; (5) maintain socially appropriate behavior; and, (6) adhere to basic standards of neatness and cleanliness. (R. at 366.) In support of these limitations, Dr. Hackleton cited to Plaintiff's "frequent panic attacks" and "trouble concentrating." (R. at 366.)

Regarding adaptation, Dr. Hackleton opined that Plaintiff had a marked degree of limitation in her ability to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (R. at 367.) When prompted, Dr. Hackleton again failed to identify any medical or clinical findings that supported this assessment. (R. at 367.)

The ALJ afforded Dr. Hackleton's mental capacity assessment little weight, noting that the evidence of record did not support the degree of limitation that she endorsed. (R. at 25.) The ALJ repeated the same findings from Dr. Fielding's consultative examination that she used to discredit the other opinions, including that Plaintiff exhibited no signs of cognitive deficits, could spell "world" backwards, and could complete serial threes and simple math calculations. (R. at 26.) The ALJ also repeated that Plaintiff demonstrated normal attention and concentration despite a flat affect and complaints of panic attacks and racing thoughts. (R. at 26.) And the ALJ cited to Dr. Fielding's observation that Plaintiff could not regulate her life as well now as she had in the past. (R. at 26.)

24

### 4.    *The ALJ's Explanations Prove Legally Insufficient.*

Because the ALJ relied on the same evidence of record to justify the weight assigned to all four medical opinions, the Court will analyze the ALJs explanations together.  To that end, the Court agrees with Plaintiff that the ALJ's explanation for the weight assigned to all four opinions proves legally deficient.  (Pl.'s Mem. at 9-12.)  For one, in assessing the opinions of Drs. Leizer and Schniewind, the ALJ simply set forth findings from Dr. Fielding's consultative examination without explaining whether those findings proved consistent or inconsistent with the doctors' opinions.  (R. at 25.)  Although the Court can surmise that the consultative findings proved inconsistent with the doctors' opinions, the ALJ also recited Dr. Fielding's observation that Plaintiff could not regulate her life now as well as she had in the past, which appears to support Dr. Leizer and Dr. Schniewind's opinions, creating further confusion.  (R. at 25.)  Such a deficient and seemingly inconsistent recitation of the evidence deprives the Court of its ability to perform a meaningful review.  *Woods*, 883 F.3d at 694.

As for the ALJ's explanation of the weight assigned to the opinions of Dr. Hackleton and Dr. Fielding, although the ALJ explained that Plaintiff's performance during her consultative examination proved inconsistent with both opinions, the ALJ again recited Dr. Fielding's observation that Plaintiff could not regulate her life now as well as she had in the past, which appears to support both opinions.  (R. at 25-26.)  Consequently, the Court must guess why the ALJ recited evidence that appears to support both opinions when the ALJ ultimately concluded that both opinions proved inconsistent with the evidence of record, requiring remand.

Ultimately, because the ALJ failed to explain how she harmonized the conflicting findings to which she cited, the Court cannot meaningfully review whether substantial evidence supports her decision to grant each of the opinions in question partial or little weight.  *See*

25

*Patterson*, 846 F.3d at 663 (holding that an ALJ's failure to show his work rendered his decision

unreviewable) (citing *Kohler v. Astrue*, 546 F.3d 260, 267 (2d Cir. 2008)).  Accordingly, the

Court must remand for further consideration of the medical opinions.

V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for

Summary Judgment (ECF No. 17) be GRANTED, that Defendant's Motion for Summary

Judgment (ECF No. 19) be DENIED and that the final decision of the Commissioner be

VACATED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g).[6]

Let the Clerk forward a copy of this Report and Recommendation to Senior United States

District Judge Robert E. Payne and all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and**

**recommendations of the Magistrate Judge contained in the foregoing report within**

**fourteen (14) days after being served with a copy of this report may result in the waiver of**

**any right to a de novo review of the determinations contained in the report and such failure**

---

[6] On August 30, 2019, Defendant moved to file supplemental briefing on a separate issue with the ALJ's RFC assessment, (Mot. for Leave to File Suppl. Br. & Br. in Supp. Thereof (ECF No. 21)), which the Court granted on September 3, 2019, (ECF No. 22).  Specifically, Defendant identifies a potential issue with the ALJ's decision to limit Plaintiff to jobs that are goal-oriented rather than at a production-rate pace and whether that limitation accounts for the ALJ's step-three conclusion that Plaintiff had moderate limitations in maintaining concentration, persistence and pace. (Def.'s Suppl. Br. (ECF No. 23) at 2.)  Anticipating that the Court might remand on this issue, Defendant contends that Plaintiff has waived any right to raise the issue, because she did not raise it in her opening brief. (Def.'s Suppl. Br. at 2.)  Plaintiff responds that Defendant "resuscitated" any arguments relating to the ALJ's RFC determinations by requesting supplemental briefing. (Pl.'s Reply to Def.'s Suppl. Br. (ECF No. 24) at 1-3.)  Because the deficiencies identified by the Court require the ALJ to reassess Plaintiff's RFC on remand, including her mental limitations, the Court will not reach the merits of this issue.

26

Case 3:18-cv-00797-REP   Document 25   Filed 09/23/19   Page 27 of 27 PageID# 183

shall bar you from attacking on appeal the findings and conclusions accepted and adopted

by the District Judge except upon grounds of plain error.

_____/s/_____
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  September 23, 2019

27